**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ANDRE KITTRELL,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 23-CV-0811** |
| | : | |
| **BARRY SMITH, *et al.*,** | : | |
| **Defendants.** | : | |

**MEMORANDUM**

**KENNEY, J.**                                                      **APRIL 28, 2023**

Plaintiff Andre Kittrell, a prisoner currently housed at SCI Chester, filed a *pro se* Complaint raising negligence, medical malpractice, and constitutional claims pursuant to 42 U.S.C. § 1983 based on alleged deliberate indifference to two medical conditions, namely a ruptured ligament in his knee and rectal bleeding.  He has named forty-two Defendants in the caption of his Complaint, against many of whom he makes no substantive allegations.  All are named in their official as well as individual capacities.  Kittrell also seeks leave to proceed *in forma pauperis*.  For the following reasons, the Court will grant Kittrell's leave to proceed *in forma pauperis*, dismiss certain claims and Defendants, and direct service of the Complaint against remaining Defendants.

**I.     FACTUAL ALLEGATIONS**

Kittrell's allegations are quite lengthy.[1]  In sum, he complains that two medical issues have been allegedly ignored, misdiagnosed, or inadequately addressed by corrections officials and

---

[1] The facts set forth in this Memorandum are taken from Kittrell's Complaint (ECF No. 2). Kittrell's Complaint consists of the Court's form complaint available to prisoners to raise constitutional claims and a typewritten portion.  The Court will deem the entire submission to constitute the Complaint, and adopt the continuous pagination assigned to the Complaint by the CM/ECF docketing system.

medical professionals since he began his incarceration in the Pennsylvania prison system in May 2021.

## A.        Knee Injury

Kittrell alleges that he entered the Pennsylvania prison system in May 2021, assigned to SCI Houtzdale, having been diagnosed with a ruptured ACL and wearing a knee immobilizer. (Compl. at 13.)  Defendant Lt. Oliver confiscated the immobilizer because it contained metal elements, but Kittrell was issued metal crutches.  (*Id*. at 13—14.)  Kittrell complained to Oliver who sent a medical request for Kittrell, and Oliver allegedly said he would speak to medical officials.  Kittrell asserts that medical personnel told him that Oliver did not speak with them.  (*Id*. at 14.)  Oliver apparently told Kittrell that Kittrell would receive a non-metal sleeve to support his knee, which Kittrell did receive, but Kittrell did not get permission to use the immobilizer even though he asked for it to be returned "[f]or it is better protection in refraining the knee from dislocating." (*Id*.)

Defendant Terri Sechrengost, the health care coordinator at SCI Houtzdale, told Kittrell on June 6, 2021, that Kittrell was scheduled for an orthopedic visit.  (*Id*. at 15.)  On July 13, Kittrell was taken to Penn State Orthopedic and seen by Defendant Dr. Bader who diagnosed a torn biceps femoris.  (*Id*. at 16).  Dr. Bader showed Kittrell an x-ray and told him he could not repair the injury and would have to "[r]econstruct it around the repairing of the ACL." (*Id*.)  Dr. Bader allegedly told Kittrell that the sleeve Kittrell was issued at the prison did not do anything but keep his knee warm, "and an immobilizer would be more appropriate to stabilize the knee." (*Id*.)  Dr. Bader

---

The spellings of many names in the Complaint are not consistent.  The Court will use the first spelling of each name as it appears in the Complaint.  While Kittrell intersperses the facts about his knee problem and his gastro-intestinal problem, the Court will discuss them separately for the sake of clarity.

wrote a report diagnosing the injury, recommending treatment with anti-inflammatories and Tylenol for pain, and an "[e]valuation with repeat MRI for Preoperative follow-up to review MRI." (*Id*.)  In response, Dr. Naji, the SCI Houtzdale medical director, prescribed meloxicam, an anti-inflammatory drug.  (*Id*.)  Through the end of July, Kittrell submitted request slips to Defendant Sechrengost seeking the MRI and met with Defendant Medical Records Coordinator April Gardner, the medical records coordinator at SCI Houtzdale, to sign a release to obtain medical records from Lankenau Hospital.  (*Id*. at 17.)  Kittrell received an MRI at UPMC Altoona on September 27, 2021.  (*Id*. at 18.)  Defendant Dr. Tokhi read this MRI as normal on November 28, 2021.  (*Id*.)

Kittrell was told the results of the MRI were normal on October 14, 2021 by Defendant PA Austin.  (*Id*.)  The report was sent to the outside orthopedist, Dr. Bader, who determined there was no need to see Kittrell.  (*Id*.)  Thereafter, Kittrell submitted several other requests asking for Dr. Bader's treatment plan.  He was informed on November 2, that "[y]our MRI was sent to the Orthopedic Surgeon and he read it and it was normal, so no need for you to be seen again by him." (*Id*. at 19.)  Kittrell filed a grievance with Defendant Health Service Administrator Jeff Mease about the lack of a follow-up appointment since his prior x-ray showed a torn ligament that Dr. Bader told him needed to be reconstructed.  (*Id*.)  Kittrell claims that Mease's grievance response, that the MRI was normal and no surgical follow-up was needed, "is blatant deliberate indifference to my serious medical need and gross negligence."  (*Id*. (emphasis and capitalization omitted).) Kittrell also filed a grievance with Defendant Sechrengost, who also told him that there would be no surgical follow-up based on the MRI result.  (*Id*. at 20.)  Kittrell received similar responses from Defendants Gardner and Holly Fike and accused Mease of misrepresenting the MRI report.

(*Id*.)  Kittrell claims that on November 5, 2021, unspecified SCI Houtzdale officials took away his bottom bunk and bottom tier status, presumably based on the "normal" MRI report.  (*Id*.)

Kittrell next wrote to Defendant Dr. Yucha at Premier Orthopedic to advise him that his second MRI result came back normal, and Dr. Yucha later spoke with Kittrell on the phone. According to Kittrell, Dr. Yucha told him the "normal" report for the second MRI was incorrect and that surgery was needed.  (*Id*.)  He claimed to Dr. Yucha that the SCI Houtzdale officials were misrepresenting "the true interpretation of the second MRI, trying to avoid the ACL surgery."  (*Id*.) Kittrell also wrote to Defendant Dr. Costanzo at Premier.  (*Id*.)  Dr. Bader allegedly told Sechrengost that Kittrell had contacted his office, and Sechrengost told Kittrell he was not permitted to do that.  (*Id*. at 21.)  Kittrell attended a meeting on January 12, 2022, after submitting a sick call request, where Defendants Sechrengost, PA Tori, and PA Jane Doe "ridiculed" Kittrell when he tried to speak with them. (*Id*.) P.A. Doe asked Kittrell, "[W]here did [you] receive [your] medical degree" and Kittrell was subsequently "put out of the Medical [Department]" by Defendant CO Smith.  (*Id*.)

After Kittrell arrived at SCI Chester on February 10, 2022, he continued to complain about pain in his knee and difficulty with stairs.  (*Id*.)  Kittrell was seen by Defendant PA Nicholson and Defendant Dr. Little, who allegedly confirmed that "surgery was needed," but due to the normal result of the second MRI, Dr. Little would not be able to approve further orthopedic visits.  (*Id*.) Nicholson allegedly told Kittrell that when Nicholson and Dr. Little submit paperwork to the "higher ups" they would deny his request to be seen by an outside specialist and that the Department of Corrections "doesn't like to pay for these kind of surgeries."  (*Id*. at 22.)  Kittrell allegedly told Nicholson and Dr. Little that Premier scheduled a tele-med call in which they informed Kittrell that the results of the second MRI were "wrong" since an area that was supposed

to be grey was shown as black, indicating that the area of the knee healed incorrectly and that surgery was mandated. (*Id*.) As a result of this sick call, Kittrell was referred for physical therapy allegedly because the weakness in his knee was beginning to affect his hip. (*Id*.)

Kittrell met with Defendant SCI Chester records supervisor Ms. Birch on May 12, 2022, during which Kittrell "was able to write down the [d]octor's notes, impressions, and discussions that occurred during the visit." (*Id*.) Kittrell submitted a sick call on May 17 to complain about his medical issues and was seen by PA Nicholson on May 18. (*Id*.) In that visit, Nicholson allegedly told Kittrell that he could "live with a torn ACL. . . . I agree with [Kittrell's claim that it could cause him further injury] but the DOC isn't going to pay for the surgery." (*Id*.) On June 23, Kittrell told Nicholson that he had not yet received a knee brace prescribed "many months ago," and Nicholson responded, "It wasn't ordered yet because it[']s an expensive purchase." (*Id*. at 22—23.) Kittrell again asked for surgery on July 13, 2022 and noted he had yet to receive his brace. (*Id*. at 23.) He filed a grievance over the denial of surgery and brace on July 18, stating that his physical therapist, Defendant Robert Zekonis, had ordered the brace to prevent or limit further injury. (*Id*.)

Defendant Favoloro, the SCI Chester health care coordinator, denied Kittrell's grievance on July 18, 2022, citing the normal result recorded for the second MRI to support that there was no need for surgery. She also allegedly said that "[t]he knee brace being ordered does not . . . constitute that this is a serious medical need. If existing, an ACL Tear would not classify as serious." (*Id*.) Kittrell's appeal of Favoloro's decision to Defendant Facility Manager Gina Clark was denied on August 3, 2022. (*Id*. at 24.)

Kittrell cites a report from Premier Orthopedics, dated October 26, 2022 and prepared by Defendant Dr. Bruce R. Lutz, indicating "Sprain of ACL of left knee today's impression: prior

ACL rupture from MVA (motor vehicle accident) 2019 by Dr. Costanzo. MRI from 2019 & 2021 were reviewed showing ACL rupture & L achman on exam today. Recommend to f/u with Dr. Yucha or Hummer for this."  (*Id*. (capitalization omitted)).

At a sick call visit with Dr. Little on November 11, Dr. Little concluded that Kittrell's knee "'definitely' isn't normal" and stated he would submit "a Collegial Review" for a surgical consult. (*Id*. (underline omitted)).  On November 28, Favoloro confirmed that his "Ortho Consult" had been ordered and would be scheduled.  (*Id*. at 29.)  Kittrell was seen at Premier on December 12, 2022 where he was allegedly assessed with an ACL tear, MCL tear, Meniscus tear, "MRI Left Kenn F/U MRI."  (*Id*. at 30.)  Favoloro told Kittrell on December 19 the MRI "was just approved" and would be scheduled.  (*Id*.)

Kittrell alleges that he was transferred to SCI Benner for the MRI on his left knee and was subsequently returned to SCI Chester where he met with Dr. Little, Favoloro, and a non-defendant Doe on January 5, 2023.  (*Id*.)  Kittrell alleges that Dr. Little told him, "Your MRI results are Remarkable.  I think it[']s time to put this entire ACL thing to bed."  (*Id*.)  Kittrell complained to Dr. Little about the "constant misdiagnosis of these MRIs by Radiologists" that caused his predicament.  (*Id*. at 30—31.)  Dr. Little allegedly responded that the earlier MRI records showed that Kittrell's knee was normal, but that Kittrell insisted to him that "every Orthopedic concluded an ACL Tear."  (*Id*. at 31.)  During this office visit, Dr. Little was able to find the 2019 MRI report indicating the ACL tear and, although Favoloro allegedly acknowledged that an ACL tear does not heal on its own, Dr. Little told Kittrell that his had healed.  (*Id.*)

### B.    Gastro-intestinal Issues

Kittrell also alleges that he suffers from rectal bleeding and has requested a colonoscopy. (*Id*. at 15.)  Defendant PA Austin performed a digital rectal exam to check for blood on May 20,

2021.  (*Id*. at 15.)  Kittrell asserts he has a history of "very bad" hemorrhoids and apparently fears he could get colon cancer.  (*Id*.)  Kittrell has made numerous requests for a colonoscopy, which he claims he had been scheduled to receive prior to his incarceration.  (*Id*. at 15, 16, 17, 29, 30, 32.)

On July 25, 2021, Kittrell submitted a request slip to Defendant Sechrengost asking if he could send his own stool sample to a lab himself since he knew there was blood in his stool even though members of the SCI Houtzdale "medical team" told him that his test for blood in his stool was negative.  (*Id*. at 17.)  Kittrell discussed this issue with Dr. Naji and Sechrengost on July 29, 2021, mentioning dark stools, intestinal pain, discharge, and dizzy spells.  (*Id*.)  Defendant April Gardner had Kittrell sign a release to get medical records from Lankenau Medical Center where Kittrell was previously scheduled for a colonoscopy.  (*Id*.)  Kittrell asserts that a hemoccult test on August 2, 2021 was positive for blood in his stool.  (*Id*.)  At a follow-up appointment on August 23 with PA Austin and Dr. Naji, Kittrell discussed a treatment plan because, Kittrell alleges, Naji "never submitted a treatment plan and this is when M.D. Naji made the decision to treat me for [hemorrhoids]."  (*Id.* at 18.)  Kittrell alleges, however, that he was already being treated for hemorrhoids and that he nevertheless continued to experience these symptoms.  (*Id.*)  Kittrell also claims that the Lankenau records were not received because an incorrect date of birth was placed on the forms, requiring another copy to be submitted.  (*Id*. at 17—18.)

Kittrell also requested a colonoscopy on November 1, 2022, after he had been transferred to SCI Chester.  (*Id*. at 29.)  On November 10, Kittrell submitted a sick call complaining of pain in his intestine and bloody stools.  Kittrell was seen by Dr. Little the next day.  Kittrell submitted a grievance on November 21 and another sick call request on November 24.  (*Id*.)  Defendant Favoloro responded that there was no "GI consult ordered.  I will ask Dr. Little."  (*Id*.)  On December 1, Favoloro responded that "Dr. Little ordered the Colonoscopy ASAP so it can be

scheduled." (*Id.*)  However, on December 19, Favoloro allegedly told Kittrell that "I have requested Dr. Little order the G.I. Consult.  It [the colonoscopy] cannot be scheduled until there is an approved consult.  If your [sic] having issues please sign up for sick call." (*Id.* at 30.)  On January 5, 2023, Dr. Little told Kittrell that he was waiting for approval for a colonoscopy appointment, stating, "Although colon/rectal recommended a colonoscopy, it wasn't a very strong recommendation." (*Id.* (capitalizations omitted).)

At that point, Kittrell asserts, he had been waiting two years for the appointment due to the blood in his stool and persistent intestinal pain. (*Id.*)  Kittrell asserts that Dr. Little was deliberately delaying the colonoscopy. (*Id.*)  Kittrell submitted another request to Favoloro on January 18 who responded on January 24 that "Dr. Little submitted for the Colonoscopy.  Collegial [SCI Chester's outside GI specialist practice] requested repeat bloodwork first.  If a Colonoscopy is ordered, Collegial needs to approve it.  Dr. Little spoke with Premier.  They want to review the Disc.  It will be sent." (*Id.* at 32.)  Kittrell told Favoloro that there was no need for more bloodwork since a specialist [presumably a reference to the doctor seen at Lankenau] "has already requested/recommended a Colonoscopy" due to Kittrell's symptoms, and "a 'non-specialist' is not authorized to over-ride their decision." (*Id.* at 32).  Favoloro responded that Kittrell has "the right to refuse any treatment," that Collegial makes recommendations about treatment, that Favoloro has no role in ordering consults, and that "[t]his is what [C]ollegial decided as the plan.  If they review and feel the Colonoscopy is warranted, it will be ordered." (*Id.* at 33.)

### C.    Claims

Kittrell asserts constitutional claims against all named Defendants for delaying treatment for his knee injury and colonoscopy. (*Id.* at 24—25.)  He alleges that Defendant Wellpath is the healthcare provider contracted by the Pennsylvania Department of Corrections and is responsible

for the conduct of its employees and approving medical treatment by outside vendors. (*Id*. at 25.) Kittrell asserts that Defendants Wetzel, as the former Secretary of the DOC, and George Little, as the Acting Secretary, are responsible for DOC policies and training of employees. (*Id*.) Kittrell also asserts state law negligence and medical malpractice claims against all Defendants. (*Id*. at 26.) Kittrell seeks money damages.[2]

## II.   STANDARD OF REVIEW

The Court will grant Kittrell leave to proceed *in forma pauperis*.[3] Accordingly, 28 U.S.C. § 1915(e)(2)(B)(ii) requires the Court to dismiss the Complaint if it fails to state a claim. The Court must determine whether the Complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted). "'At this early stage of the litigation,' '[the Court will] accept the facts alleged in [the *pro se*] complaint as true,' 'draw[] all reasonable inferences in [the plaintiff's] favor,' and 'ask only whether [that] complaint, liberally construed, . . . contains facts sufficient to state a plausible [] claim.'" *Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021) (quoting *Perez v. Fenoglio*, 792 F.3d 768, 774, 782 (7th Cir. 2015)). Conclusory allegations do not suffice. *Iqbal*, 556 U.S. at 678.

Because Kittrell is proceeding *pro se*, the Court construes the allegations of the Complaint liberally. *Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021). However, "'pro se litigants still must

---

[2] Kittrell also seeks a declaration that all Defendants violated his rights. (Compl. at 26.) Declaratory relief is unavailable to adjudicate past conduct, so Kittrell's request for this declaratory relief is improper. *See Corliss v. O'Brien*, 200 F. App'x 80, 84 (3d Cir. 2006) (*per curiam*) ("Declaratory judgment is inappropriate solely to adjudicate past conduct" and is also not "meant simply to proclaim that one party is liable to another").

[3] Because Kittrell is a prisoner, he is still required to pay the full amount of the filing fee in installments under the provisions of the Prison Litigation Reform Act. *See* 28 U.S.C. § 1915(b).

allege sufficient facts in their complaints to support a claim.'"  *Id.* (quoting *Mala*, 704 F. 3d at 245).  An unrepresented litigant '"cannot flout procedural rules—they must abide by the same rules that apply to all other litigants.'"  *Id.*

## III.   DISCUSSION

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988).  Furthermore, "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs" to be liable.  *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988); *Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) ("Personal involvement requires particular 'allegations of personal direction or of actual knowledge and acquiescence.'" (quoting *Rode*, 845 F.2d at 1207)).

### A.      Named Parties With No Allegations

Kittrell includes in the list of Defendants the following individuals and entities against whom he makes no factual allegations:  Superintendent Smith, Grievance Coordinator Hnatkovich (also referred to as "S. Hnatkovich), RN J. Altemus, Facility Manager M Lvicic, Grievance Coordinator Kerri Moore, Regional Coordinator Dancha, Grievance Coordinator M. Quinn, Alicia Ross, Superintendent K. Eason, Lackawana County Ultra Sound, and "Rivera."  Because there are no allegations that these Defendants had personal involvement in conduct that either violated Kittrell's civil rights, *see Rode*, 845 F.2d at 1207, or constituted negligence under state law, these Defendants will be dismissed.

### B.    Non-state Actors

Kittrell has named as Defendants individuals who are medical providers outside the prison, to whom Kittrell was referred for testing, diagnosis, or treatment.  Whether these Defendants may be considered as acting under color of state law — i.e., whether they are state actors as that term is used in § 1983 — depends on whether there is "such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Leshko v. Servis*, 423 F.3d 337, 339 (3d Cir. 2005) (internal quotations omitted).  "To answer that question, [the Third Circuit has] outlined three broad tests generated by Supreme Court jurisprudence to determine whether state action exists: (1) whether the private entity has exercised powers that are traditionally the exclusive prerogative of the state; (2) whether the private party has acted with the help of or in concert with state officials; and (3) whether the state has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity." *Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009) (internal quotations and alteration omitted); *see also West*, 487 U.S. at 49, 54 (1988) (stating that, to act under "color of state law" a defendant must be "clothed with the authority of state law" and holding that a physician who is under contract with the state to provide medical services to inmates at a state-prison hospital acted "under color of state law" within the meaning of § 1983 when treating an inmate").

Whether or not outside medical providers, to whom prison officials refer inmates for medical treatment that the prison cannot itself provide, can be deemed to be state actors generally turns on whether those providers do so pursuant to a contract with the state.  *See Illescas v. Annucci*, No. 21-8473, 2022 WL 17539696, at *4 (S.D.N.Y. Dec. 7, 2022) (collecting cases and distinguishing between defendants that treat prisoner plaintiffs at private hospitals where there is

no allegation that the treatment is "provided pursuant to a contract between the government and the private hospital" and non-public medical providers that provide inmates with medical treatment outside of a prison pursuant to a contract, and holding that the latter may be state actors); *Bevins v. Becker Cty., Minnesota*, No. 16-4340, 2018 WL 7247176, at *10 (D. Minn. Oct. 30, 2018), *report and recommendation adopted*, 2019 WL 397322 (D. Minn. Jan. 31, 2019) (finding private physicians were not state actors where there was no contract and no proof of an ongoing relationship between the jail and the physicians, where it appeared that inmates were taken to physicians' facilities on an as-needed basis, and the physicians treated inmates in a private facility and exercised independent medical judgment); *Griffis v. Medford*, No. 05-3040, 2007 WL 2752373, at *6 (W.D. Ark. Sept. 20, 2007) (finding that "a private physician treating an inmate at a private facility utilizing his independent medical judgment is not answerable to the state and does not act under color of state law for purposes of § 1983"); *Sykes v. McPhillips*, 412 F. Supp. 2d 197, 204—05 (N.D.N.Y. 2006) ("Dr. Jagoda's non-contractual provision of medical services outside of the prison context, in an emergency room, is not sufficient conduct to support a finding of state actor status"); *see also Steele v. Meade Cty. Jail Officials*, No. 06-5087, 2008 WL 4449924, at *2 n.1 (D.S.D. Sept. 18, 2008) (citing cases examining whether the actions of private physicians who are not under contract with the jail fall under the umbrella of state action); *cf. Connor v. Donnelly*, 42 F.3d 220, 222—23 (4th Cir. 1994) (holding that private physicians who treat state prisoners without a contract are state actors because of their function of providing medical care on behalf of the state and with the state's authorization).

Kittrell has named several private practice doctors, hospitals and medical practices that appear to have performed tests or treated him for his conditions, but Kittrell does not specifically allege whether they did so under a contract with the Commonwealth, as opposed to on an "as

needed" basis.  Dr. Bader allegedly works for Penn State Orthopedic (Compl. at 19); Crozier

Chester Hospital is where Kittrell was taken for his first MRI (*id*. at 30); UPMC Altoona was

where Kittrell was taken for his second MRI (*id*. at 18); Dr. Tokhi was the radiologist at UPMC

Altoona who reported the result of the second MRI (*id*.); and Drs. Costanzo, Yucha, Hummer and

Lutz of Premier Orthopedic examined Kittrell's knee (*id*. at 19, 20, 24, 30—31).  Kittrell does not

allege that any of these Defendants provided medical services under a contract with the

Commonwealth.

Even if Kittrell had alleged that the private practice doctors and entities were state actors,

as discussed below, Kittrell has also failed to allege that these Defendants, other than Dr. Bader,

UPMC Altoona, and Dr. Tokhi, were deliberately indifferent to his serious medical needs, failed

to treat him, or treated him improperly.  Thus, the § 1983 claims against Drs. Costanzo, Yucha,

Hummer and Lutz; Penn State Orthopedic; Crozier Chester Hospital; and Premier Orthopedic will

be dismissed with prejudice.  However, after construing the Complain liberally, the § 1983 claims

against Dr. Bader, UPMC Altoona, and Dr. Tokhi based on deliberate indifference will, as

discussed further below, be served for a responsive pleading. Kittrell may not be in a position to

know whether or not Dr. Bader, UPMC Altoona, and Dr. Tokhi performed their services pursuant

to a contract and thus exercised powers traditionally the exclusive prerogative of the state, acted

in concert with state officials, or were joint participants with the Commonwealth in the challenged

activity.

### C.    Claims Based on Grievances

Kittrell appears to have named several Defendants solely because they were involved in

prison grievances he filed about his medical care.  Kittrell filed a grievance with Defendant Health

Service Administrator Jeff Mease about the lack of a follow-up appointment.  (Compl. at 19.)

Kittrell also filed a grievance with Defendant Sechrengost, who also told Kittrell that there would be no surgical follow-up based on the MRI result and appealed that grievance to Defendant Clark. (*Id*. at 20, 24.)  Defendant Favoloro, the SCI Chester health care coordinator, denied a grievance about the lack of a need for surgery since the second MRI showed a normal result.  (*Id*. at 23, 29.)  Also, Chief Grievance Coordinator D. Varner, Grievance Coordinator Hnatkovich, Facility Manager Lvicic, and Grievance Coordinator Moore may have played a role in Kittrell's grievances although Kittrell does not make specific allegations against them.

Claims based on the handling of prison grievances fail because "[p]rison inmates do not have a constitutionally protected right to a grievance process." *Jackson v. Gordon*, 145 F. App'x 774, 777 (3d Cir. 2005) (*per curiam*); *see also Caldwell v. Beard*, 324 F. App'x 186, 189 (3d Cir. 2009) (*per curiam*).  Accordingly, the facts alleged by Kittrell about grievances do not give rise to a plausible basis for a constitutional claim and will be dismissed with prejudice.  *See also Woods v. First Corr. Med. Inc*., 446 F. App'x 400, 403 (3d Cir. 2011) (*per curiam*) ("[B]ecause a prisoner has no free-standing constitutional right to an effective grievance process, [a prisoner] cannot maintain a constitutional claim . . . based upon his perception that [the defendant] ignored and/or failed to properly investigate his grievances." (citing *Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991))).  Accordingly, all claims based on the handling of grievances will be dismissed with prejudice and those Defendants whose only involvement with Kittrell's claims are based on their involvement in the grievance process will be terminated as defendants, namely Mease, Hnatkovich, Lvicic, and Moore.

### D.    Deliberate Indifference Claims

To state a constitutional claim based on the failure to provide medical treatment, a prisoner must allege facts indicating that prison officials were deliberately indifferent to his serious medical

needs.  *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994).[4]  A prison official is not deliberately indifferent "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id.* at 837.  "A medical need is serious, . . . if it is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention."  *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (internal quotations omitted); *see also Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991) (holding that a serious medical need exists where "failure to treat can be expected to lead to substantial and unnecessary suffering").  Deliberate indifference is properly alleged "where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment."  *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).  Allegations of medical malpractice and mere disagreement regarding proper medical treatment are insufficient to establish a constitutional violation.  *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004).  Finally, "[i]f a prisoner is under the care of medical experts . . . , a non-medical prison official will generally be justified in believing that the prisoner is in capable hands."  *See Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004); *see also Carter v. Smith*, 483 F. App'x 705, 708 (3d Cir. 2012) (*per curiam*) ("Prison officials cannot be

---

[4] The standard under the Eighth Amendment for convicted prisoners and under the Fourteenth Amendment for pretrial detainees is essentially the same for purposes of this analysis and courts will cite cases applying either amendment.  *See Moore v. Luffey*, 767 F. App'x 335, 340 n.2 (3d Cir. 2019); *Parkell v. Morgan*, 682 F. App'x 155, 159—60 (3d Cir. 2017) (*per curiam*).

held to be deliberately indifferent merely because they did not respond to the medical complaints of a prisoner who was already being treated by the prison medical staff.").

### 1. Lt. Oliver

Lt. Oliver allegedly confiscated Kittrell's metal knee immobilizer when Kittrell arrived at SCI Houtzdale.  (Compl. at 14.)  Oliver sent a medical request for the immobilizer but allegedly failed to personally speak to medical officials.  Kittrell apparently learned of the failure by speaking with medical personnel himself.  (*Id*.)  Kittrell did receive a non-metal sleeve to support his knee which Oliver had told Kittrell he would receive. However, Kittrell did not get permission to use the metal knee immobilizer even though he asked for it to be returned "for it is better protection in refraining the knee from dislocating."  (*Id*.)  Kittrell's Eighth Amendment deliberate indifference claim against Lt. Oliver will be served for a responsive pleading based on the allegation that he denied Kittrell the use of the knee immobilizer.

### 2. Dr. Naji

The allegations concerning Dr. Naji, the medical director at SCI Houtzdale, are sparse. Following Kittrell's appointment with Dr. Bader in July 2021, Dr. Naji followed Dr. Bader's instructions and prescribed Kittrell an anti-inflammatory medication.  (Compl. at 16.)  Kittrell also asserts that he and Naji discussed Kittrell's gastro-intestinal issues on July 29, 2021, at which time a release was prepared to obtain medical records from Lankenau Hospital.  (*Id*. at 17.)  A hemoccult test on August 2, 2021 was positive for blood in Kittrell's stool, and at a follow-up appointment on August 23, Dr. Naji and Kittrell discussed a treatment plan for Kittrell's hemorrhoid condition. (*Id*.)  While Kittrell alleges that Dr. Naji had not previously submitted a treatment plan, there is no allegation that the condition had been brought to Dr. Naji's attention before July 29, 2021.  In the intervening period, the hemoccult test was performed and prior records were obtained.  Thus, it is

not plausible that the delay in providing necessary medical treatment was based on a non-medical reason. *Rouse*, 182 F.3d at 197. The claims against Dr. Naji, therefore, will be dismissed.

### 3.    Terri Sechrengost

Separate from the non-plausible claim involving Kittrell's grievances discussed earlier, Defendant Sechrengost, the health care coordinator at SCI Houtzdale, allegedly told Kittrell on June 6, 2021 that he was scheduled for an orthopedic visit, and that visit occurred on July 13 at Penn State Orthopedic. (Compl. at 16.) Kittrell submitted request slips to Sechrengost seeking an MRI, and subsequently received an MRI on September 27, 2021. (*Id*. at 18.) After Dr. Bader allegedly told Sechrengost that Kittrell had contacted his office, Sechrengost told Kittrell that he was not permitted to do that. (*Id*. at 21.) Kittrell attended a sick call on January 12, 2022 where Sechrengost, along with PA Tori and PA Jane Doe, "ridiculed" Kittrell when he tried to speak with them. (*Id*.) On July 25, 2021, Kittrell submitted a request slip to Sechrengost asking if Kittrell himself could take his own stool sample and send it to a lab since, Kittrell claimed, he knew there was blood in his stool even though members of the SCI Houtzdale "medical team" told him that his test for blood in his stool was negative. (*Id*. at 17.) Kittrell then discussed the issue with Sechrengost and Dr. Naji on July 29, 2021. (*Id*.)

Kittrell's claim that Sechrengost interfered with his ability to receive care for his knee issue by barring him from contacting Dr. Bader and barring him from doing an independent stool test will be served for a responsive pleading. However, as Kittrell concedes that Sechrengost timely scheduled him for an orthopedic visit and MRI, a claim based on those allegations does not assert a plausible claim of delay. Finally, to the extent Sechrengost allegedly ridiculed Kittrell, there is no plausible assertion that this prevented Kittrell from receiving medical care. Moreover, verbal taunts, without more, are insufficient to violate the Constitution. *See Dunbar v. Barone*, 487 F.

App'x 721, 723 (3d Cir. 2012) (holding that threats that inmate was a "marked man and that his days were numbered" did not state Eighth Amendment claim); *McBride v. Deer*, 240 F.3d 1287, 1291 n. 3 (10th Cir. 2001) (holding that threat to spray inmate with mace did not violate Eighth Amendment); *DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000) ("Standing alone, simple verbal harassment does not constitute cruel and unusual punishment, deprive a prisoner of a protected liberty interest or deny a prisoner equal protection of the laws.").

### 4.      April Gardner and Holly Fike

Deliberate indifference claims against April Gardner, the medical records coordinator at SCI Houtzdale, and Holly Fike, are also not plausible.  Gardner allegedly met with Kittrell at the end of July 2021 to sign a release to obtain medical records from Lankenau.  (Compl. at 17.) Kittrell thereafter received his MRI on September 27, 2021.  (*Id*. at 18.)  After Defendant Sechrengost told Kittrell that there would be no surgical follow-up based on the MRI result, Kittrell received a similar response from Gardner and Fike and was told that he could obtain his medical records by putting in a request for them.  (*Id*. at 20.)  It appears from the Complaint that Gardner's and Fike's roles here were simply to coordinate and provide medical records.  None of these allegations shows a plausible claim that Gardner or Fike denied, delayed, or refused to provide medical treatment, and as such these Defendants will be dismissed.

### 4.      PA Austin

Kittrell alleges that PA Austin told him that the results of Kittrell's MRI were normal on October 14, 2021.  (Compl. at 19.)  Austin performed a digital rectal exam to check for blood on May 20, 2021, (*Id*. at 15), and he was present when on August 23, 2021, Dr. Naji and Kittrell discussed a treatment plan for Kittrell's hemorrhoid condition.  (*Id*. at 17.)   None of these

allegations shows a plausible claim that Austin denied, delayed, or refused to provide medical treatment.

### 5.    PA Tori, PA Jane Doe, and CO Smith

Kittrell asserts that when he attended a sick call on January 12, 2022 and raised questions about whether his MRI results were correct, PA Tori and PA Jane, along with Defendant Sechrengost, "ridiculed" him when he tried to speak with them. Doe allegedly asked Kittrell, "[W]here did [you] receive [your] medical degree[?]" (Compl. at 21.)  Kittrell was then taken out of the medical department by Defendant CO Smith.  (*Id*.)  For the reasons already stated with regard to Defendant Sechrengost, the "ridicule" allegations do not show a plausible claim that these Defendants denied, delayed, or refused to provide medical treatment.  The allegation that CO Smith made Kittrell leave the medical area over this incident also does not allege that Kittrell was denied, delayed, or refused treatment on that occasion since Kittrell does not identify a serious medical need for which attention was immediately required when CO Smith told him to leave.

### 6.    Ms. Birch

Kittrell alleges that he met with Defendant SCI Chester records supervisor Ms. Birch on May 12, 2022, during which he was able to hand-copy doctors' notes. (Compl. at 22.)  Because this allegation does not show a plausible claim that Birch denied, delayed, or refused to provide medical treatment, the claim against Birch will be dismissed.

### 7.    Robert Zekonis

Defendant Physical Therapist Robert Zekonis allegedly ordered the brace to prevent or limit further injury to Kittrell's knee.  (Compl. at 23.)  Although Kittrell asserts that he did not receive the brace because it was too expensive, there is no allegation that Zekonis was involved in

the decision to deny the brace Zekonis had ordered.  Accordingly, the deliberate indifference claim against Zekonis is not plausible and will be dismissed.

### 8.    Favoloro

In addition to the implausible claim involving Favoloro's involvement in grievances discussed earlier, Kittrell asserts claims of liability against Favoloro because she was involved in scheduling medical appointments. On November 28, 2022, Favoloro confirmed that Kittrell would receive an orthopedic consult appointment, and Kittrell was subsequently seen at Premier on December 12, 2022.  (Compl. at 29—30.)  Favoloro also told Kittrell on December 19 that the MRI "was just approved" and would be scheduled, after which Kittrell was transferred to SCI Benner for the MRI on his left knee.  (*Id*.)

As to Kittrell's gastro-intestinal issues, Favoloro told Kittrell that there was no "GI consult ordered.  I will ask Dr. Little," and then told Kittrell that "Dr. Little order[ed] the Colonoscopy ASAP so it can be scheduled."  (*Id*. at 29.)  However, on December 19, Favoloro allegedly told Kittrell, "I have requested [that] Dr. Little order the G.I. Consult.  It cannot be scheduled until there is an approved consult.  If your [sic] having issues please sign up for sick call."  (*Id*. at 30.)  Favoloro also responded to Kittrell's January 18 request slip, stating that Dr. Little submitted for the Colonoscopy, but that the outside GI specialist practice requested repeat bloodwork.  (*Id*. at 32.)  After Kittrell objected that there was no need for additional bloodwork, Favoloro responded that Kittrell had "the right to refuse any treatment," but that she had no role in ordering consults.  (*Id*. at 33.)

None of these allegations show a plausible claim that Favoloro denied, delayed, or refused to provide medical treatment.  She timely scheduled Kittrell's knee consult and MRI.  As to the colonoscopy, Favoloro merely passed on information she received from medical providers. Any

delay appears related to Kittrell's reluctance to abide by the medical provider's request for additional bloodwork.  Accordingly, the claims against Favoloro will be dismissed.

### 9.    Former Secretary Wetzel and Acting Secretary Little

The only allegation Kittrell makes against Defendants Wetzel and Little is that, as Secretaries of the DOC, they are responsible for DOC policies and the training of employees. (Compl. at 25.)  There are "two general ways in which a supervisor-defendant may be liable for unconstitutional acts undertaken by subordinates."  *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *reversed on other grounds by Taylor v. Barkes*, 575 U.S. 822 (2015).  First, a supervisor may be liable if he or she "'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm."  *Id.* (quoting *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (alteration in original)).  "Second, a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in the subordinate's unconstitutional conduct."  *Id.*

Generalized allegations that a supervisory defendant is "in charge of" or "responsible for" an office or facility are insufficient to allege personal involvement in an underlying constitutional violation.  *See Saisi v. Murray*, 822 F. App'x 47, 48 (3d Cir. 2020) (*per curiam*) ("Saisi asserted that some defendants were 'in charge of agencies that allowed this to happen,' and that liability stemmed merely from defendants' 'belief' that their conduct would be 'tolerated.'  However, a director cannot be held liable 'simply because of his position as the head of the [agency].'" (quoting *Evancho v. Fisher*, 423 F.3d 347, 354 (3d Cir. 2005)).

"Under Section 1983, a supervisor may be liable for [his or her] failure to train or supervise employees. . . ."  *Whitfield v. City of Philadelphia*, 587 F. Supp. 2d 657, 666 (E.D. Pa. 2008).  A

21

claim for supervisory liability or liability based upon a failure to train involves four elements: (1) that an existing policy created an unreasonable risk of constitutional injury; (2) the supervisor was aware of this unreasonable risk; (3) the supervisor was indifferent to the risk; and (4) the injury resulted from the policy or practice. *See Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989). Where a need for "more or different training . . . is so obvious, and the inadequacy so likely to result in constitutional violations, that the failure to train . . . can fairly be said to represent official policy," *City of Canton v. Ohio*, 489 U.S. 378, 390 (1989), and that failure to train "actually causes injury," a supervisor may be held liable.  In resolving

> the issue of [supervisory] liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform.  That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the [supervisor], for the officer's shortcomings may have resulted from factors other than a faulty training program. . . .  Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training. . . .  Moreover, for liability to attach . . . the identified deficiency in [the] training program must be closely related to the ultimate injury.

*Id*. at 390—91.

Kittrell's bald allegation that Wetzel and Little are responsible for DOC policies does not state a plausible claim.  Kittrell does not identify a specific policy, practice, or custom that directly caused him to suffer constitutional harm.  Kittrell also fails to allege that Wetzel or Little either directly participated in violating Kittrell's rights, directed others to violate Kittrell's rights, or had knowledge of and acquiesced in a subordinate's unconstitutional conduct.  Similarly, Kittrell's bald allegation that Wetzel and Little are responsible for training does not state a plausible claim since Kittrell does not allege that an existing policy created an unreasonable risk of constitutional injury, that Wetzel and Little were aware of this unreasonable risk and indifferent to it, or that Kittrell's injury resulted from the policy or practice.  These Defendants will also be dismissed;

however, the Court will permit Kittrell to file an amended complaint if he is capable of asserting plausible claims based on policy or training.

### 10.    PA Nicholson, Dr. Little, and Wellpath

The Court will direct service of the § 1983 deliberate indifference claims against Defendants PA Nicholson, Dr. Little, and Wellpath that relate to Kittrell's knee condition.  The Court finds on statutory screening that the claims against these Defendants are plausible because Kittrell alleges that these Defendants denied, delayed, or refused to provide treatment for a serious medical need.  Specifically, from the time Kittrell arrived at SCI Chester on February 10, 2022, until a third MRI was performed at SCI Benner in late 2022 or early 2023, Kittrell was allegedly denied treatment for his knee because a prior MRI was incorrectly interpreted.  During this time, PA Nicholson and Dr. Little allegedly stated that while Kittrell needed surgery on his knee, the surgery and further outside orthopedic visits would not be provided because of the normal result of the second MRI, notwithstanding that Kittrell allegedly told them that Premier scheduled a tele-med call in which they informed him that the results of the second MRI were "wrong."  (Compl. at 22.)  Nicholson also allegedly told Kittrell that he could "live with a torn ACL. . . . I agree with [Kittrell's claim that it could cause him further injury] but the DOC isn't going to pay for the surgery."  (*Id*.)  Nicholson also allegedly delayed Kittrell getting a knee brace ordered by Physical Therapist Zekonis.  (*Id*. at 22—23.)

The allegation against these Defendants that relate to Kittrell's colonoscopy, however, do not allege a plausible deliberate indifference claim.  While Kittrell requested a colonoscopy after he had been transferred to SCI Chester in November 2022 (*Id.* at 29), Kittrell alleges that he was seen by Dr. Little for his symptoms almost immediately, and that a GI consult was ordered.  (*Id*.)  On December 1, Dr. Little apparently ordered the colonoscopy but on December 19, Kittrell was

informed that the colonoscopy could not be scheduled until there was an approved consult.  On January 5, 2023, Dr. Little told Kittrell that he was waiting for approval for a colonoscopy appointment stating "although colon/rectal recommended a colonoscopy, it wasn't a very strong recommendation."  (*Id*. (capitalizations omitted).)  While Kittrell asserts in conclusory terms that Dr. Little was deliberately delaying the colonoscopy, Kittrell also concedes that he was non-compliant with the request to submit additional bloodwork to support his request.  (*Id*. at 32—33.)  Moreover, Kittrell alleges only that he suffered from hemorrhoids and merely feared that this could cause colon cancer.  In sum, these allegations fall short of stating a plausible claim that Kittrell was denied treatment for a serious medical need.

### 12.    Official Capacity Claims and Claims Against the Commonwealth

Kittrell named all Defendants in their official capacity as well as individual capacities and seeks money damages.  He also names the Department of Corrections and the Bureau of Health Care Services as Defendants.  To the extent the official capacity claims are brought against employees, officials, or agencies of the Commonwealth of Pennsylvania, these claims are dismissed with prejudice.

The Eleventh Amendment bars suits against a state and its agencies in federal court that seek monetary damages.[5]  *See Pennhurst State Sch. And Hosp. v. Halderman*, 465 U.S. 89, 99—

---

[5] Because of the bar of the Eleventh Amendment and because the Commonwealth and its agencies are not "persons" as that term is used in § 1983, *see Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65—66 (1989), all § 1983 claims against the DOC and the Bureau of Health Care Services are also dismissed with prejudice.  *Robinson v. Bureau of Health Care Servs.*, No. 20-1796, 2021 WL 4306116, at *5 (M.D. Pa. Sept. 22, 2021) ("[T]he Bureau of Health Care Services is not a "person" for purposes of Section 1983 and will be dismissed with prejudice").  Because Eleventh Amendment immunity also precludes state law negligence claims, *see Brooks v. Beard*, 167 F. App'x 923, 926 (3d Cir. 2006) (*per curiam*) (noting, with regard to inmate's negligence claims, that "the state has expressly retained its Eleventh Amendment immunity for purposes of federal lawsuits."), these Defendants will be terminated from the lawsuit.

100 (1984); *A.W. v. Jersey City Public Schs.*, 341 F.3d 234, 238 (3d Cir. 2003). Suits against state employees and officials acting in their official capacities are really suits against the employing government agency, and as such, are also barred by the Eleventh Amendment. *A.W.*, 341 F.3d at 238; *see also Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70—71 (1989). Additionally, the Third Circuit has held that, where a claim is filed against state officials who were not directly involved in the activities that caused the alleged constitutional violation but are instead named as defendants because of their positions in state government, the state officials are deemed to be sued in their official capacities and thus entitled to Eleventh Amendment immunity. *Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 310 (3d Cir. 2020). As the Commonwealth has not waived its Eleventh Amendment immunity for lawsuits filed in federal court, *see* 42 Pa. Cons. Stat. § 8521-22, it and its departments, as well as their officials and employees sued in their official capacities, are immune from suits filed in federal court.[6]

  To the extent Kittrell attempts to bring official capacity claims against employees of contract or non-contract medical providers, those claims are also not cognizable because those providers are private entities. *See Kreis v. Northampton Cnty. Prison*, No. 21-2360, 2022 WL 4236692, at \*8 (E.D. Pa. Sept. 14, 2022) (stating that official capacity claims are "inapplicable to suits against private parties where the entity is also susceptible to suit") citing *Owens v. Connections Cmty. Support Programs, Inc.,* 840 F.Supp.2d 791, 796 (D. Del. 2012) ("Generally, a suit against a [ ] public officer in his or her official capacity is used to compel that officer to take some official action [and that] concept . . . is inapplicable to suits against private parties where the

---

[6] Eleventh Amendment immunity also precludes negligence claims. *See Brooks v. Beard*, 167 F. App'x 923, 926 (3d Cir. 2006) (*per curiam*) (noting, with regard to inmate's negligence claims, that "the state has expressly retained its Eleventh Amendment immunity for purposes of federal lawsuits.").

entity is also susceptible to suit.").  Even if official capacity suits against individuals who work for private companies are cognizable, the suit would, in effect, be one against the company for whom that individual works.  *See Kentucky v. Graham,* 473 U.S. 159, 105 (1985).  Since Kittrell has named Wellpath and the other provider entities as Defendants, the official capacity claims against their employees are dismissed as duplicative.  *See Stanek v. St. Charles Cmty. Unit Sch. Dist. No. 303*, 783 F.3d 634, 644 (7th Cir. 2015) ("The district court correctly dismissed these defendants in their official capacity because the Staneks also sued the District."); *Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004) ("The district court correctly held that the § 1983 claim against Martin in his official capacity as Superintendent is essentially a claim against the Board and thus should be dismissed as duplicative."); *see also Graham*, 473 U.S. at 166 ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.").

     **E.**     **State Law Claims**

          **1.**     **Negligence**

     Kittrell also asserts state law negligence claims against each named Defendant.  In order to plead a plausible negligence claim in Pennsylvania, a plaintiff must assert the following four elements: "(1) a duty or obligation recognized by law; (2) a breach of that duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual damages."  *Grossman v. Barke*, 868 A.2d 561, 566 (Pa. Super. Ct. 2005) (quoting *Estate of Swift v. Northeastern Hosp.*, 690 A.2d 719, 722 (Pa. Super. Ct. 1997)).  For the reasons discussed in the deliberate indifference context, nothing in the allegations Kittrell asserts against Gardner, Fike, Birch, Favoloro, Wetzel, or Little assert the breach of a duty recognized by law.  Gardner, Fike, Birch, and Favoloro are merely alleged to have interacted with Kittrell in the scope of their various jobs and none of them

is alleged to have delayed, denied, or refused Kittrell medical care.  The allegations that Wetzel and Little are responsible for policy and training do not assert plausible negligence claims because they are conclusory.  *Iqbal*, 556 U.S. at 678.

Moreover, state prison officials are immune from suit under state law for actions within the scope of their duties, except in instances in which the immunity has been specifically waived.  *See Royster v. Corizon*, No. 13-1449, 2014 WL 1655088, at 8 (M.D. Pa. Apr. 23, 2014); *see also* 1 Pa. Cons. Stat. § 2310 ("officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity").  However, the immunity statute provides an exception to sovereign immunity for medical-professional liability that is only applicable to health care personnel.  *See* 42 Pa. Cons. Stat. § 8522(b) (providing exception for "[a]cts of health care employees of Commonwealth agency medical facilities or institutions or by a Commonwealth party who is a doctor, dentist, nurse or related health care personnel."); *see also Williams v. Syed*, 782 A.2d 1090 (Pa. Commw. Ct. 2001) (inmate failed to allege medical malpractice claim against prison superintendent).  Because Lt. Oliver is not a medical professional, the § 1983 deliberate indifference claim based on his denying Kittrell his knee immobilizer will proceed, but any negligence claim against Lt. Oliver may not.  Finally, construing the Complaint liberally, Defendant Sechrengost, the health care coordinator at SCI Houtzdale, may be a health care professional under the immunity statute, and, therefore, the negligence claim against her will be served for a responsive pleading.

## 2.    Medical Malpractice

When a plaintiff's malpractice claim against medical providers sounds in negligence, as here, the elements of the claim are the same as those in ordinary negligence actions.  *Toogood v.*

*Owen J. Rogal, D.D.S., P.C.*, 824 A.2d 1140, 1145 (Pa. 2003). "As such, medical malpractice can be broadly defined as the unwarranted departure from generally accepted standards of medical practice resulting in injury to a patient, including all liability-producing conduct arising from the rendition of professional medical services." *Id.* (citing *Hodgson v. Bigelow*, 7 A.2d 338 (Pa. 1939). Thus, to plausibly plead the claim, a medical malpractice plaintiff must allege "a duty owed by the physician to the patient, a breach of that duty by the physician, that the breach was the proximate cause of the harm suffered, and the damages suffered were a direct result of the harm."[7] *Toogood*, 824 A.2d at 1145. The medical malpractice negligence claim concerning the treatment of Kittrell's knee condition will be served on Defendants Sechrengost, Nicholson, Little, and Wellpath for the reasons already stated with regard to the deliberate indifference claims against them.

Kittrell also asserts medical malpractice claims against Dr. Bader who examined Kittrell at Penn State Orthopedic, but refused to see Kittrell again after reading the results of the second MRI (Compl. at 19); Crozier Chester Hospital where Kittrell was taken for his first MRI (*Id.* at 30); UPMC Altoona where Kittrell was taken for his second MRI (*Id.* at 18); Dr. Tokhi, the radiologist at UPMC Altoona who reported the allegedly incorrect result of the second MRI (*Id.* ); and Drs. Costanzo, Yucha, Hummer, and Lutz of Premier Orthopedic who examined Kittrell's knee (*Id.* at 19, 20, 24, 30—31). Because Kittrell alleges that the second MRI was interpreted incorrectly, his claims against Dr. Bader, UPMC Altoona, and Dr. Tokhi will be served for a responsive pleading. However, because Kittrell fails to allege that the treatment by the other medical professionals was an unwarranted departure from generally accepted standards of medical

---

[7] In addition, because the negligence of a physician "encompasses matters not within the ordinary knowledge and experience of laypersons a medical malpractice plaintiff must present expert testimony to establish the applicable standard of care, the deviation from that standard, causation and the extent of the injury." *Toogood*, 824 A.2d at 1145.

practice, the claims against Costanzo, Yucha, Hummer, Lutz, Crozier Chester Hospital, and Premier Orthopedic will be dismissed.[8]

## IV.   CONCLUSION

For the reasons provided, the Court is prepared at this time to serve the following claims for a responsive pleading by the following Defendants:  (1) the § 1983 deliberate indifference claims asserted against Lt. Oliver, PA Nicholson, Dr. Little, Wellpath, Terry Sechrengost, Dr. Bader, UPMC Altoona, and Dr. Tokhi; and (2) the negligence or medical malpractice claims asserted against Sechrengost, Dr. Bader, UPMC Altoona, and Dr. Tokhi, based on Kittrell's knee injury.  Kittrell will be granted the option of proceeding on these claims only or filing an amended complaint if he seeks to reassert the claims dismissed without prejudice against Defendants Former Secretary Wetzel and Acting Secretary George Little.  All other claims against all other Defendants contained in Kittrell's Complaint will be dismissed with prejudice.

An appropriate order with additional information on filing an amended complaint is attached.

**BY THE COURT:**

**/s/ Chad F. Kenney**

**CHAD F. KENNEY, J.**

---

[8] For this same reason, Kittrell cannot assert plausible § 1983 claims against Dr. Costanzo, Dr. Yucha, Dr. Hummer, Dr. Lutz, Crozier Chester Hospital, and Premier Orthopedic even if he had alleged that they were state actors.  Each allegedly treated Kittrell when he was referred to them by prison officials and none allegedly denied, delayed, refused to treat him, or treated him improperly.